In re Kevin Q. SULLIVAN, Debtor.

**Digital Commerce, Ltd., Plaintiff,**

**v.**

**Kevin Q. Sullivan, Defendant.**

**Bankruptcy No. GG 02–04287.**

**Adversary No. 02–88290.**

United States Bankruptcy Court, W.D. Michigan.

March 11, 2004.

---

Jeffrey S. Crampton, Esq., Koernke & Crampton, P.C., Grand Rapids, MI, for Plaintiff, Digital Commerce, Ltd.

Miles J. Murphy, III, Esq., Flickinger & Plachta, P.C., Grand Rapids, MI, and Robert F. Wardrop, II, Esq., Wardrop & Wardrop, P.C., Grand Rapids, MI, for Debtor–Defendant, Kevin Q. Sullivan.

## OPINION REGARDING DETERMINATION AND DISCHARGEABILITY OF DEBT

JAMES D. GREGG, Chief Judge.

### I. JURISDICTION

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. The

bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.). This adversary proceeding is a core proceeding because it involves a determination as to the dischargeability of a debt. 28 U.S.C. § 157(b)(2)(I). This opinion constitutes the court's findings of fact and conclusions of law. FED R. BANKR. P. 7052.

■■■ The exceptions to discharge enumerated in § 523 are to be strictly construed in favor of the debtor. *Rembert v. AT & T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988). The creditor bears the burden of proving every element of its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

## II.  FACTS

The Debtor–Defendant, Kevin Q. Sullivan (hereinafter "Debtor"), filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on April 15, 2002.[1] Prior to his bankruptcy, the Debtor served as President of the Plaintiff, Digital Commerce, Limited, (hereinafter "Digital Commerce"). On July 1, 2002, Digital Commerce commenced this adversary proceeding against the Debtor. Trial of this adversary proceeding was held before this court over a span of four days. During the trial, the court heard testimony from eight witnesses [2] and considered numerous exhibits that were admitted into evidence. The following factual findings were drawn from this evidence.

Digital Commerce was a Michigan corporation that specialized in providing "business internet solutions." Tr. I at 9. Simply put, Digital Commerce designed software (or altered existing software) that enabled its clients to sell their products or services to businesses and consumers over the internet. As part of this process, Digital Commerce also designed links from its clients' internet sites to their internal accounting and inventory software.

Digital Commerce was founded by Craig T. Hall (hereinafter "Hall") in 1996. The Debtor served as Vice President of Business Development for Digital Commerce from 1997 until 2000, and became President of Digital Commerce in January of 2000. In his capacity as President, the Debtor was chiefly responsible for sales and the day-to-day administration of Digital Commerce. Throughout his association with Digital Commerce, the Debtor was an "at will" employee. No evidence of an employment contract or a covenant not to compete between the Debtor and Digital

---

1. The Bankruptcy Code is contained in 11 U.S.C. §§ 101–1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ _____."

2. The witnesses were: Rebecca Erin Scholten, the Debtor, Craig T. Hall, James Michael Brandon, Jeffrey Muller, Derrick Lolli, Troy Spruit and Michael J. Kanis. The deposition of an additional witness, Wayne Schuurman, was admitted into evidence in lieu of live testimony. All witnesses were credible, except for the Debtor who was evasive and partially untruthful. The court notes the Debtor's lack of veracity, and has discounted his testimony accordingly. However, the Debtor's evasiveness has not caused the court to draw any negative inferences. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); *accord Duddy v. Kitchen & Bath Distribs., Inc. (In re H.J. Scheirich Co.)*, 982 F.2d 945, 949 (6th Cir.1993).

Commerce was presented. Based upon the testimony, no such agreement existed.

The Debtor became dissatisfied with his employment at Digital Commerce even before he assumed his responsibilities as President of the company. On April 5, 1999, the Debtor e-mailed Hall asking that equity in Digital Commerce be included as part of the compensation offered to some to the company's key employees, most importantly to himself. In the message, the Debtor stated that he "would really like to know what [his] stake [in Digital Commerce] looks like . . . ." Exh. 11. Although discussions regarding the Debtor's "stake" in Digital Commerce continued throughout 1999, the Debtor never received equity in Digital Commerce. By December of 1999, the Debtor was admittedly "frustrated" over the equity issue. Tr. I at 136; Exh. 13.

In the spring of 2000, Digital Commerce began experiencing financial difficulties. During this time period, Digital Commerce was completing work on a few large projects, but little new business was coming in.[3] See generally Exh. 27 (Digital Commerce Team Meeting Agendas). Beginning in May 2000, weekly team meetings, during which Digital Commerce employees discussed existing clients and potential new business, became less frequent. Exh. 27. These team meetings ceased entirely in July of 2000. Exh. 27; Tr. I at 38.

Employee utilization, i.e., the percentage of employees' time that was spent working on "billable" projects, also decreased. Exh. 60. As business slowed, Digital Commerce employees perceived a corresponding decrease in the Debtor's dedication to the company. The Debtor spent less time in the office, communicated less frequently with staff members, and engaged in long, closed-door meetings, frequently with another Digital Commerce employee, Jason Pliml (hereinafter "Pliml").[4] The Debtor also initiated a search for alternative employment in the spring of 2000. See generally Exh. 17.

An incident in July of 2000 illustrates the severity of Digital Commerce's financial problems. Prior to that time, in March of 2000, Hall had given the Debtor a check for $10,000, to be cashed if Digital Commerce ever encountered a cash "emergency." On July 21, 2000, the Debtor e-mailed Hall to remind him that Lean Logistics, another company owned by Hall, owed Digital Commerce $9,000 in past due accounts receivable. Exh. 24. When Lean Logistics failed to pay this amount to Digital Commerce, the Debtor caused the "emergency" check to be cashed on July 27, 2000. Exh. 25. Digital Commerce used the funds from the check to meet its payroll that week. Exh. 24.

Notwithstanding the troubled financial climate at Digital Commerce, during April

---

**3.** Rebecca Erin Scholten, Digital Commerce's Office Manager at the time, offered detailed and credible testimony regarding these facts at trial. Three other Digital Commerce employees, Jeffrey Muller, Derrick Lolli and Troy Spruit, corroborated Scholten's perceptions.

**4.** The court rejects the Debtor's suggestion that the subject of these closed-door meetings was solely related to a potential merger between Digital Commerce and Group Interactive, another software development company. Tr. I at 79. According to Scholten's testimony, the closed-door meetings between the

Debtor and Pliml had become daily occurrences by late May, 2000. Tr. at 51–52. Michael Kanis, the former President of Group Interactive, testified that his first contact with the Debtor did not occur until July 10, 2000. Tr. IV at 50. Although discussions between Group Interactive and Digital Commerce continued through August, 2000, Kanis described the contacts as "high level" and "abbreviated." Tr. IV at 54. The court rejects the Debtor's testimony that the negotiations which began in July necessitated daily closed-door meetings in May and June.

2000, the Debtor contacted a new potential client, ASR Corporation (hereinafter "ASR"). Exh. 39. James Michael Brandon (hereinafter "Brandon"), the President of ASR, became acquainted with the Debtor in their roles as "soccer-dads." The Debtor's initial e-mail to Brandon, dated April 6, 2000, identified some possible "areas of opportunity" for Digital Commerce to assist ASR in developing and implementing new internet technology. Exh. 39. On April 13, 2000, Brandon informed the Debtor that he was "interested in discussing how your organization might be able to assist [ASR]," but Brandon had not yet had time to consider the Debtor's suggestions in detail. Exh. 40.

At the same time he was soliciting ASR's business for Digital Commerce, the Debtor was also investigating employment opportunities with ASR for himself. On April 24, 2000, the Debtor sent a resume and cover letter to Brandon. Exh. 41. Although Brandon's response, dated May 4, 2000, did not directly address job opportunities for the Debtor, Brandon asked if Digital Commerce would be willing to conduct an evaluation of ASR's internet capabilities and to subsequently offer a proposal (including a time line and costs) detailing how Digital Commerce could help ASR reach its technological goals. Exh. 43. Digital Commerce referred to this type of evaluation as a "needs analysis." Brandon's message also indicated that working together on the project would give him a chance to better understand the Debtor's "approach and capabilities," which might, in turn, lead to discussions regarding "other opportunities." Exh. 43. In response to Brandon's message, the Debtor set up a meeting with Brandon to discuss how "Digital Commerce may work with ASR" and "what an appropriate next step might be." Exh. 44. The Debtor also listed ASR as potential new business on Digital Commerce Team Meeting Agendas throughout May 2000. Exh. 27.

The Debtor met with Brandon on May 10, 2000. During that meeting, the Debtor made a sales presentation about Digital Commerce. Tr. III at 54. The presentation did not cause Brandon to develop a "strong interest" in Digital Commerce. Tr. III at 54. Instead, discussion at the meeting focused upon potential employment opportunities for the Debtor with ASR. Tr. III at 54–55. A follow-up e-mail from the Debtor to Brandon, sent on May 11, 2000, documents those discussions. The Debtor's e-mail states that the meeting gave the Debtor a "much better picture" of ASR's capabilities and needs. Exh. 46. Yet the Debtor's message places a much greater emphasis on the "alignment of ASR's needs and [the Debtor's] personal capabilities," and even asks whether Brandon and ASR's other shareholders had "ever consider[ed] taking on another partner." Exh. 46. Several days later, on May 17, 2000, the Debtor sent another e-mail to Brandon stating that he had recently finished drafting a "mutually beneficial" plan. Exh. 47. The plan was *not* a proposed arrangement between Digital Commerce and ASR; rather it was a draft Employment Agreement between the Debtor and ASR. Tr. I at 145.

Discussions regarding potential employment opportunities for the Debtor with ASR concluded with an e-mail from the Debtor to Brandon on May 25, 2000. Exh. 48. The Debtor's message stated that the "missing equity component" in the job offer from ASR prevented him from moving forward with negotiations. Exh. 48. With regard to Digital Commerce's potential relationship with ASR, the Debtor stated that he "would not feel comfortable taking on ASR as a client under current circumstances." Exh. 48.

Although the Debtor's message to Brandon on May 25, 2000, marked the end of the Debtor's dialogue with ASR—at least temporarily—the Debtor's job search continued into the summer of 2000. Exh. 17; Tr. I at 148. However, in about July of 2000, the Debtor shifted his focus from finding a position with an existing firm to establishing his own business. Tr. I at 148. The Debtor eventually decided to start his own company with Pliml. This new enterprise, Sullivan & Pliml, was to do work similar to that done by Digital Commerce.[5] By early August 2000, the new company was beginning to take shape: among other things, the Debtor registered several internet domain names for the new entity and began "prospecting" friends and business acquaintances as potential clients. See, e.g., Exh. 6 & 37. Many of these organizational and marketing activities were conducted during business hours, when the Debtor should have been focused on his work for Digital Commerce. In an e-mail to Pliml on August 2, 2000, the Debtor directed Pliml to delete all messages pertaining to Sullivan & Pliml from Digital Commerce's servers and desktops. Exh. 20. The Debtor admitted that he was "just getting paranoid." Exh. 20. The court finds the Debtor knew he was wrong in being disloyal to Digital Commerce and he actively concealed his disloyalty.[6]

Brandon, as President of ASR, was one of the prospective clients the Debtor contacted on behalf of Sullivan & Pliml. On August 4, 2000, the Debtor e-mailed Brandon an outline of various "areas of opportunity" which he thought Sullivan & Pliml might be able to offer ASR. Exh. 49. After some preliminary discussions, the Debtor suggested that Sullivan & Pliml submit a formal "Scope & Proposal" for the potential ASR project. Exh. 51. Upon confirming that Sullivan & Pliml would not charge ASR for preparing the proposal, Brandon agreed that a formal proposal would be appropriate. Exh. 51 & 52. It is noteworthy that these activities took place while the Debtor was still the President of Digital Commerce and before he tendered his resignation.

The Debtor e-mailed a document entitled "Scope & Proposal" to Brandon on August 9, 2000.[7] Exh. 53. Under the Scope & Proposal, Sullivan & Pliml agreed to undertake an "accelerated Discovery/Validation process" (essentially a needs analysis) that generally involved evaluating ASR's current internet capabilities, identifying its goals, and making concrete recommendations (including "system diagrams") for how those goals could be attained. The estimated cost of the entire "Discovery/Validation process," as stated in the Scope & Proposal, was $15,930.

---

5. In an attempt to distinguish Sullivan & Pliml from Digital Commerce, the Debtor, in his testimony, created subtle differences in the type of work undertaken by the two companies. However, notwithstanding some minor differences, Digital Commerce and Sullivan & Pliml engaged in essentially the same type of work. In a letter to Brandon, the Debtor described Digital Commerce as an "e-commerce integration company focused on aligning internet technology with business strategy." Exh. 41. Sullivan & Pliml also billed themselves as "technology experts who ... show customers how to find new profits using today's technology." Exh. 3. Like Digi-

tal Commerce, Sullivan & Pliml developed e-commerce internet applications for its clients. Tr. I at 119.

6. Notwithstanding the concealment by the Debtor, Digital Commerce was able to recover a portion of the deleted messages from the Debtor's computer hard-drive. Some of the deleted messages were admitted into evidence at trial.

7. This document was sent on a Wednesday afternoon, when the Debtor was still employed by Digital Commerce. Exh. 53.

Exh. 55. A final version of the Scope & Proposal was signed by Brandon, on behalf of ASR, and the Debtor, on behalf of Sullivan & Pliml, Inc.,[8] on September 13, 2000. Exh. 55

On August 7, 2000, as negotiations with ASR continued, the Debtor e-mailed Hall to officially resign from his position with Digital Commerce. Exh. 23. In a follow-up e-mail from the Debtor to Hall on August 8, 2000, the Debtor elaborated on his resignation by informing Hall that Pliml would also be leaving Digital Commerce, and that the Debtor and Pliml were planning to start their own business. Exh. R. Through a conversation with Scholten, less than one week later, Hall learned of the exact nature of the Debtor's new business venture. Tr. II at 24. Although the Debtor had originally offered to continue working for Digital Commerce until mid-September 2000, Hall told the Debtor to leave Digital Commerce immediately upon learning that the Debtor planned to open his own technology consulting company. Tr. II at 24. It was clear to Hall then, as it is to the court now, that the Debtor was directly competing with Digital Commerce.

Shortly after the Debtor's departure from Digital Commerce, Hall assessed the company's financial health and viability. According to Hall, this investigation revealed that Digital Commerce was in "serious trouble"—without the Debtor's involvement, there was little new work coming in, employees were leaving the organization, and the company was generally in disarray. Tr. II at 25. Fearing that the organization was rapidly "spiraling down," in September 2000, Hall arranged to sell Digital Commerce's entire book of business to another one of its former com-

petitors, the Image Group. Tr. II at 27. The sale price was one dollar. Tr. II at 28. The court finds that, when this sale took place, Digital Commerce was crippled and could no longer function as a viable business entity.

Sullivan & Pliml entered into a contract regarding the implementation phase of the ASR project. It continued its work for ASR through October 2001. As noted by Hall, the duration of this relationship is not particularly surprising because the entity that prepares the initial needs analysis almost always is engaged to complete the implementation phase as well. Tr. IV at 70. Over the course of its business with ASR, Sullivan & Pliml was paid approximately $400,000 for its work.[9] Exh. 66.

## III. ISSUES

Did the Debtor breach his fiduciary duty to Digital Commerce by usurping a corporate business opportunity for his own personal benefit? If so, what is the amount of Digital Commerce's damages? Should any such debt to Digital Commerce be deemed nondischargeable under § 523(a)(2)(A), (a)(4) and/or (a)(6)?

## IV. DISCUSSION

A. *Digital Commerce's State Law Claims.*

1. *Liability for Breach of Fiduciary Duty.*

The crux of Digital Commerce's claim against the Debtor is that the Debtor committed numerous breaches of his state law duty of loyalty during his tenure as President of the corporation. Of these alleged breaches, the most egregious charge is

---

**8.** Sullivan & Pliml filed Articles of Incorporation on or about August 24, 2000.

**9.** No evidence regarding related expenses was presented at trial, making a calculation of the total *"profits"* earned by Sullivan & Pliml from the ASR account impossible.

that the Debtor usurped the opportunity to work with ASR for his own benefit.[10] Specifically, Digital Commerce claims that the Debtor affirmatively advised ASR not to work with Digital Commerce in May 2000. Then, a few months later, while still employed as President of Digital Commerce, the Debtor solicited ASR's business for himself, through the new Sullivan & Pliml.

■■ Michigan common law imposes a fiduciary duty of loyalty on all employees of a corporation that forbids them from taking action contrary to the interests of their employers. *Clark & Gregory, Inc. v. Hanson (In re Hanson)*, 225 B.R. 366, 375 (Bankr.W.D.Mich.1998) (Stevenson, J.) (quoting *Restatement (Second) of Agency* § 387 (1958) ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.")). Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition. *See Chem–Trend, Inc. v. McCarthy*, 780 F.Supp. 458, 460 (E.D.Mich.1991) (explaining, in a ruling on a preliminary injunction request, that while "[t]he mere planning and preparation" to engage in a competing business did not constitute a breach of the duty of loyalty, an employee who distributed his competing product to customers for testing, entered the product in trade shows, and sold the product to his employer's customers "did more than just prepare").

■ When the employee is an officer or director of a corporation, the fiduciary duties imposed under state law are even more stringent. *Production Finishing Corp. v. Shields*, 158 Mich.App. 479, 487, 405 N.W.2d 171, 174 (1987) ("Where the agent is also an officer of a corporation for which he is acting there is added reason for rigidly adhering to the rule."). The Michigan Business Corporations Act provides that:

A director or officer shall discharge his or her duties as a director or officer ...

(a) In good faith.

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

(c) In a manner he or she reasonably believes to be in the best interests of the corporation.

Mich. Comp. Laws Ann. § 450.1541a. "It is widely recognized that the appropriation of a corporate opportunity by an officer or director" constitutes a breach of the fiduciary duty of good faith. *Production Finishing Corp. v. Shields*, 158 Mich.App. 479, 485, 405 N.W.2d 171, 174. As explained by the Michigan Court of Appeals:

A corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for his own personal gain. The rule is that if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to un-

---

**10.** Digital Commerce also alleges that the Debtor breached his fiduciary duty by: preparing to establish Sullivan & Pliml as a corporate entity during Digital Commerce time, using Digital Commerce resources to do so, and failing to disclose his intention to start a competing company to the owner of Digital Commerce, Hall. These allegations are only marginally relevant to the court's analysis, as the court has found that the Debtor breached his fiduciary duty to Digital Commerce independent of these contentions. Further, Digital Commerce has failed to present any evidence from which the court could calculate damages for these alleged actions.

dertake which is, from its nature, in the line of the corporation's business and is of practical advantage to it, and which is one in which the corporation has an interest or a reasonable expectancy, and if, by embracing the opportunity, the self interest of the officer or director will be brought into conflict with that of this corporation, the law will not permit him to seize the opportunity for himself.

*Production Finishing Corp.*, 158 Mich. App. 479, 486, 405 N.W.2d 171, 174.

■ In this instance, the chance to prepare a needs analysis for ASR was a potentially valuable business opportunity for Digital Commerce—a fact that is confirmed by the Debtor's own statements and actions. In April of 2000, the Debtor contacted Brandon, as President of ASR, regarding "areas of opportunity" for Digital Commerce to work with ASR. Throughout the next month, the Debtor listed ASR as a potential new customer on Digital Commerce's weekly team meeting agendas. From these facts it can be inferred that Digital Commerce could have reasonably expected to land ASR's business and would have been financially able to perform the needs analysis for ASR. However, instead of pursuing this opportunity on behalf of Digital Commerce, the Debtor advised ASR *not* to work with Digital Commerce. A few months later, after deciding to start his own technology company, the Debtor resumed his dialogue with ASR, ultimately diverting the opportunity to work with ASR for his own benefit. In so doing, the Debtor breached his fiduciary duty of good faith to Digital Commerce.

The Debtor argues against this conclusion on several grounds. First, the Debtor asserts that Digital Commerce and Sullivan & Pliml were not in the "same line of business." In support of this argument, the Debtor cites some technical differences in the type of work done by the two corporations. However, both entities engaged in the general business of developing and implementing internet technology—the precise type of assistance sought by ASR. Minor, technical differences in the type of activities undertaken by the two entities do not alter this court's conclusion that the Debtor stole the opportunity to work with ASR from Digital Commerce. The court rejects the Debtor's artificial distinction.

■ Second, the Debtor also argues that ASR was never officially a customer of Digital Commerce. In fact, the Debtor points to testimony given by Brandon at trial which suggests that ASR never developed a "strong interest" in working with Digital Commerce. Even assuming the Debtor's assertions on this point are correct, they do not change the outcome of this court's analysis. The Michigan Court of Appeals has specifically held that "a third party's purported refusal to deal with a corporation will not relieve a fiduciary from liability when he [has] failed to disclose the refusal to his principal." *Production Finishing Corp.*, 158 Mich.App. 479, 489, 405 N.W.2d 171, 175. Because the Debtor never reported the end of his negotiations with ASR to anyone at Digital Commerce, particularly Hall, he may not invoke "refusal to deal" as justification for diverting the ASR opportunity.

Finally, the Debtor attempts to defend his actions with regard to ASR by citing timing technicalities. Although the Debtor first contacted Brandon on behalf of Sullivan & Pliml on August 4, 2000, the Debtor argues that the official Scope & Proposal contract between Sullivan & Pliml and ASR was not signed until September 13, 2000. Because his fiduciary duties to Digital Commerce ended with his August 7 resignation, the Debtor asserts that the signing of the contract with ASR cannot possibly constitute a breach of his duty of

good faith to Digital Commerce. Again, the court rejects this argument. The Debtor's solicitation of ASR began while he was still serving as President of Digital Commerce, thus constituting a breach of his fiduciary duty of good faith. The fact that the official contract with ASR was not signed until after the Debtor left his position with Digital Commerce does nothing to alter this analysis. *See, e.g., Dowell v. Bitner*, 273 Ill.App.3d 681, 691, 210 Ill.Dec. 396, 403, 652 N.E.2d 1372, 1379 (1995) (under Illinois law, "[t]he resignation of an officer will not sever liability for transactions completed after termination of the officer's association with the corporation for transactions which ... began during the existence of the relationship").

The Debtor diverted the opportunity to prepare a needs analysis for ASR away from Digital Commerce, kept the opportunity for himself and then transferred it to his new company, Sullivan & Pliml. Digital Commerce has a valid claim against the Debtor for usurping a corporate opportunity in violation of his fiduciary duty of good faith.

## 2. *Damages.*

■ In a nondischargeable debt action, it is permissible for a bankruptcy court to determine whether a debt exists and, if necessary, the amount of the debt. *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir.1993). In this adversary proceeding, because there was no prior state court determination, this court must address these issues.

■ When an officer or director acquires an advantage from a third party "by means of his fiduciary character, he is accountable to his employer for the *profit* made." *Production Finishing Corp.*, 158 Mich.App. at 487, 405 N.W.2d at 174 (quoting *Stephenson v. Golden*, 279 Mich. 710, 736, 276 N.W. 849 (1937)) (emphasis added). Damages may not be awarded, however, based upon "mere speculation, guess or conjecture." *Archer v. Macomb County Bank*, 853 F.2d 497, 499 (6th Cir.1988).

■ The opportunity that the Debtor wrongfully diverted from Digital Commerce was the task of preparing a needs analysis for ASR—preparation of a needs analysis was the sole business topic the Debtor pursued on behalf of Digital Commerce in May of 2000 and it was the job that the Debtor's new company ultimately undertook for ASR. To accomplish the needs analysis, ASR paid Sullivan & Pliml $15,930. Therefore, the Debtor's actions caused Digital Commerce to lose a potential profit of $15,930.[11]

Digital Commerce urges this court to also include the approximately $400,000 that Sullivan & Pliml ultimately received from ASR for subsequent services. The court declines to do so. Even if Digital Commerce had exercised the opportunity to prepare the needs analysis, there was no guarantee that ASR would have retained anyone, let alone Digital Commerce, to implement the suggested plan. Hall's testimony, which stated that the company that prepares the needs analysis almost always completes the implementation phase of the project constitutes "mere speculation," and provides an insufficient basis upon which to award consequential damages. Further, after the Debtor left Digital Commerce, it was a dysfunctional shell, soon sold for one dollar, that could not have undertaken the ASR post-needs assessment contract.

Based upon the foregoing, the court finds that the Debtor's wrongful stealing of

11. The court determines this amount to be "profit" based upon the testimony that Digital Commerce employees had excess work capacity and could have accomplished this job.

a corporate opportunity resulted in a debt in the amount of $15,930. *See* § 101(12).

## B. *Nondischargeability of the Claim.*

### 1. *Introduction.*

One of the difficulties with conduct such as the Debtor's is that is does not neatly fall within the elements of section 523(a)(2), (4) or (6). Even when a debtor has cheated his employer by stealing a corporate opportunity, or some other intangible, it is not easy to categorize why the resulting debt is nondischargeable.

### 2. *Willful or Malicious Injury—§ 523(a)(6).*

■ Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." As the plain language of the statute suggests, the alleged injury must be *both* willful and malicious for the debt to be nondischargeable. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir.1999).

■ With regard to the "willful" requirement, the Supreme Court has held that a debt is nondischargeable under § 523(a)(6) only if it results from an act "done with the actual intent to cause injury."[12] *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The requisite intent to harm "exists when the defendant 'desires to cause consequences of his act, *or ... believes that the consequences of his action are substantially certain to result from it.*' " *Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620 (6th Cir. BAP 2000) (quoting *In re Markowitz*, 190 F.3d at 464) (emphasis added).

■ In the present adversary proceeding, there is little, if any, direct evidence to suggest that the Debtor's misappropriation of the ASR opportunity was motivated by an intent to harm Digital Commerce. Rather, his actions were prompted by his desire to ensure the success of his new business venture, Sullivan & Pliml. Still, under the Sixth Circuit's definition, the Debtor's usurpation of the ASR opportunity is considered "willful" if he knew that the consequences of his action (i.e., financial harm to Digital Commerce) were substantially certain to occur.

The Bankruptcy Appellate Panel of the Sixth Circuit recently addressed this aspect of the "willfulness" test in *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298 (6th Cir. BAP 2004). In that case, Monsanto Company, the plaintiff, held a judgment against the debtor, Trantham, for patent infringement. The judgment was based on Trantham's unlicensed use of cotton and soybean seeds produced with Monsanto's patented genetic technology. The district court that rendered the judgment found, inter alia, "that Trantham had admitted that his infringement was solely for the purpose of avoiding the payment of the license fee to Monsanto" and "that there was some evidence that Trantham tried to conceal his infringement by using a false name." *In re Trantham*, 304 B.R. at 307.

Analyzing the dischargeability of Trantham's resulting debt to Monsanto under § 523(a)(6), the court noted that "there was no evidence to suggest Trantham was specifically motivated by an intent to injure Monsanto." *Id.* Nonetheless, "Trantham must have known, and therefore believed, that economic damage to Monsanto was substantially certain to result from his

---

12. In this sense, § 523(a)(6) requires a debtor to commit an act akin to an intentional tort. The debtor must "intend 'the consequences of the act,' not simply 'the act itself.' " *Id.* at 62, 118 S.Ct. 974.

failure to pay the license fee." *Id.* The court dubbed the incident a "zero-sum situation," stating that Trantham "could only gain if Monsanto lost." *Id.* The court likened Trantham to other intentional tortfeasors, such as bank robbers, whose chief motive is typically to enrich themselves, not to financially injure the bank. "The injury, however, is bound to occur, and in civil terms it constitutes an intentional tort against the bank." *Id.*

The Debtor's actions here create precisely the type of zero-sum situation to which the *Trantham* court refers. The Debtor knew that, in order for Sullivan & Pliml to profit from the ASR opportunity, Digital Commerce had to lose it. He also knew that this lost opportunity would inevitably cause Digital Commerce financial harm. The Debtor's attempts at concealing information about his new business venture and its potential relationship with ASR (particularly his e-mail to Pliml encouraging him to delete e-mail that pertained to Sullivan & Pliml from his Digital Commerce computer) confirm that he knew his actions were likely to prove harmful to Digital Commerce. Consequently, the court finds that the Debtor's acts were "willful" because he knew Digital Commerce was substantially certain to suffer financial loss as a direct result of his diversion of the ASR opportunity.

Section 523(a)(6) also requires that the actions giving rise to the nondischargeable debt be malicious. In this context, "malicious means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *In re Trantham,* 304 B.R. at 308 (quoting *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986)) (internal quotation marks omitted). Here, the court has little trouble concluding that the Debtor's usurpation of the ASR opportunity was undertaken with blatant disregard for the duty of loyalty the Debtor owed to Digital Commerce as its President. The Debtor has not provided any just cause or excuse for this breach of duty. Therefore, the court finds that the debt owed by the Debtor to Digital Commerce for usurpation of the ASR opportunity is nondischargeable under § 523(a)(6).

### 3. *Fraud—§ 523(a)(2)(A).*

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, [or] services, ... to the extent obtained by false pretenses, a false representation, or actual fraud ...." To prevail in a nondischargeability action under § 523(a)(2)(A), the creditor must prove that:

> 1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; 2) the debtor intended to deceive the creditor; 3) the creditor justifiably relied on the false representation; and 4) its reliance was the proximate cause of loss.

*In re Rembert,* 141 F.3d at 281. Openly false assertions are not a strict requirement, however, as it is well-established that "material *omissions* can [also] form the basis of misrepresentation under § 523(a)(2)(A)." *McHenry v. Ward (In re Ward),* 115 B.R. 532, 539 (W.D.Mich.1990) (emphasis added). *See Semaan v. Allied Supermarkets, Inc. (In re Allied Supermarkets, Inc.),* 951 F.2d 718, 728 (6th Cir. 1991) (in a case decided under section 17(a)(2) of the former Bankruptcy Act, the predecessor to § 523(a)(2)(A), the court explained that the fact that the "deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference").

Digital Commerce's § 523(a)(2)(A) fraud claim is based on allegations that the

Debtor: (1) failed to disclose to Hall, when he initially resigned his position, that he was starting a competing company; (2) purposely deleted e-mails from his computer to prevent anyone at Digital Commerce from discovering his plans; (3) actually advised ASR not to work with Digital Commerce in May, 2000; and (4) misled Brandon in August of 2000, by allowing him to believe that the Debtor had formed his own company and was no longer employed by Digital Commerce. Of these allegations, only the first two involve possible misrepresentations or omissions by the Debtor directly *to Digital Commerce.* Further, even assuming that the Debtor lied to Hall (as contrasted to failed to disclose) about his plan to start a competing venture and deleted e-mails to conceal his plans, Digital Commerce has failed to demonstrate that it took any action in reliance on the Debtor's actions. Consequently, Digital Commerce has failed to satisfy the traditional and classic elements of fraud under § 523(a)(2)(A).

■ Notwithstanding its failure to prove the standard elements of misrepresentational fraud, Digital Commerce urges this court to apply two recent cases that have held that "actual fraud" is within the parameters of § 523(a)(2)(A). *See McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000) (creditor stated a claim for "actual fraud" under § 523(a)(2)(A) against a debtor who accepted a fraudulent transfer from her brother in an attempt to thwart the creditor's collection efforts); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich),* 259 B.R. 873 (6th Cir. BAP 2001) (the debtor, who engaged in check kiting scheme, committed "actual fraud" for purposes of § 523(a)(2)(A)). These decisions recognize that:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which

are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan,* 217 F.3d at 893 (citation omitted). Consequently, the cases rightly conclude that "actual fraud," as used in § 523(a)(2)(A), may be present even if the debtor has not made an affirmative misrepresentation or misleading omission.

■ The court notes that the debtors in both *McClellan* and *Vitanovich* engaged in egregiously fraudulent behavior. *See McClellan,* 217 F.3d at 893 (characterizing the debtor's behavior as "as blatant an abuse of the Bankruptcy Code as [the court] could imagine"). The Debtor's conduct in this case is sufficiently egregious to fall within the reasoning of the "actual fraud" decisions. His theft of a corporate opportunity by nondisclosure, and his subsequent (partially unsuccessful) attempt to cover up the evidence thereof, is compounded by his overall lack of veracity at trial. The court believes the Debtor is a cheat—the debt is nondischargeable under § 523(a)(2)(A).

4. *Fraud or Defalcation in a Fiduciary Capacity— § 523(a)(4).*

■ Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity." Under this statutory subsection, a finding of nondischargeability generally requires a fiduciary relationship, breach of that fiduciary relationship and a resulting loss. *R.E. America, Inc. v. Garver (In re Garver),* 116 F.3d 176, 178 (6th Cir.1997).

■ The nature of the fiduciary relationship necessary to trigger liability under § 523(a)(4) has been a subject of some disagreement among the federal courts. *Compare Cal–Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003) (under § 523(a)(4), the fiduciary relationship "must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt") *and Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir.1996) (same) *with The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 167 (2d Cir.1999) ("the defalcation exception is not limited to express trusts, i.e., situations were a trustee is beneficial owner of a res held and managed for a named beneficiary"). The Sixth Circuit Court of Appeals has agreed with those courts that adopt a narrow definition of "fiduciary capacity" and has held that, for purposes of § 523(a)(4), the term applies only in "situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *In re Garver*, 116 F.3d at 179. Creation of an express trust relationship is a function of state law. *See, e.g., Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 124 (6th Cir.1985) (the Michigan Insurance Code "clearly establishes an insurance agency relationship as an express trust fiduciary relationship"). Therefore, the court must look to Michigan law to determine the nature of the fiduciary relationship involved in this proceeding.

■ As discussed above, Michigan law imposes a fiduciary duty of good faith upon corporate officers and directors. *See* MICH. COMP. LAWS ANN. § 450.1541a; *Production Finishing Corp.*, 158 Mich.App. at 486, 405 N.W.2d at 174 ("It is beyond dispute that in Michigan, directors and officers of corporations are fiduciaries who owe a strict duty of good faith to the corporation which they serve."). However, Michigan law does not mandate that officers and directors are trustees with respect to corporate assets. Consequently, the Debtor's actions were not undertaken while he was acting in a "fiduciary capacity" for purposes of § 523(a)(4). The Debtor prevails under this subsection to the extent it relates to "defalcation while acting in a fiduciary capacity."

5. *Embezzlement or Larceny—§ 523(a)(4).*

■ Section 523(a)(4) also excepts from discharge those debts arising from embezzlement or larceny. Federal common law defines "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." [13] *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir. 1996). A creditor establishes his embezzlement claim "by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.*

Here, the Debtor, as President of Digital Commerce, was initially entrusted with the company's property (i.e., the business opportunity to perform the ASR needs analysis), and subsequently diverted it to his own use. In this sense, the Debtor's actions most closely resemble embezzlement, and the court's § 523(a)(4) analysis will address the elements of embezzlement.

13. By contrast, "larceny for purposes of § 523(a)(4) is defined as the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use *without the consent of the owner*." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr.N.D.Ohio 2003) (emphasis added).

Because the "property" at issue in this adversary proceeding is Digital Commerce's corporate opportunity to prepare the needs analysis for ASR, a threshold question exists: that is, can *intangible* property, such as a business opportunity, be embezzled for purposes of § 523(a)(4)?

At early common law, the type of property that could be subject to an action for the tort of conversion was "determined on the basis of the fiction of losing and finding." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 90 (5th ed.1994). "Any tangible chattel could be lost and found, and so could be converted." *Id.* Consequently, an action for conversion "would not lie for the appropriation of land, because land was incapable of being lost; and it would not lie for the appropriation of any choses [sic] in action or other intangible rights, which were incapable of being found." *Restatement (Second) of Torts* § 242 cmt. d (1965).

▮▮▮▮▮ Over time, though, the action of conversion has "undergone a slow process of extension, which has carried it beyond these ancient limits." *Id.* This "process of expansion has stopped with the kind of intangible rights which are customarily merged in, or identified with some document." W. Page Keeton et al., *supra,* § 15, at 92. As explained by the *Restatement:*

It is at present the prevailing view that there can be no conversion of an ordinary debt not represented by a document, or of such intangible rights as the goodwill of a business or the names of customers. The process of extension has not, however, necessarily terminated; and nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found.

*Restatement (Second) of Torts* § 242 cmt. f (1965). *See also* W. Page Keeton et al., *supra,* § 15, at 92 ("There is perhaps no very valid and essential reason why there might not be conversion of ... 'any species of personal property which is the subject of private ownership.' ").[14] In a nondischargeability context relating to embezzlement under § 523(a)(4), there is no cogent reason to exclude intangible property from the coverage of the statute. A creditor, in this instance an employer, can be cheated or deprived of intangible property just as easily as tangible personal property or money. In this modern society, with its great reliance upon intellectual property [15] and commercial ideas, theft of intangible property is always possible. Although the undersigned judge believes that any expansion of the meaning of "property" to include intangibles in the embezzlement context may be subject to some criticism, the facts in this case warrant a conclusion that the Debtor appropriated to his own use property (a concrete corporate opportunity) that was entrusted to him (in his capacity as President) in a fraudulent (secretive and unwarranted) manner.[16] The

14. Indeed, several courts, including the United States Supreme Court, have found criminal liability for misappropriation of intangible rights under various federal statutes. *See Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, protect newspaper's property right in keeping information confidential prior to publication); *United States v. Collins,* 56 F.3d 1416, 1419 (D.C.Cir.1995) (18 U.S.C. § 641, which criminalizes conversion any "thing of value" belonging to the federal government, "encompasses a prohibition on the conversion of intangible property.").

15. For example, patents, copyrights, trade secrets, trade names, trademarks and other proprietary rights.

16. This view is consistent with the analysis in the criminal field by the Supreme Court and

debt is nondischargeable under § 523(a)(4) to the extent it relates to "embezzlement."

## V. CONCLUSION

By diverting the ASR opportunity for his own gain, the Debtor violated his state law duty of loyalty to his former employer, Digital Commerce. For the reasons above, the debt determined by this court, in the amount of $15,930, is nondischargeable under § 523(a)(2)(A), (4) and (6). A separate order shall be entered accordingly.

D.C. Circuit Court in *Carpenter* and *Collins,*

respectively. See n. 14, immediately above.