NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0764n.06

No. 11-4205

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jul 13, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| ALVERTA L. WILLIAMS, Individually and/or doing business as Mary McLeod-Bethune Intervention and Enrichment Center, Inc.  Plaintiff-Appellee, v. RICHLAND COUNTY CHILDREN SERVICES, et al.,  Defendants; and RANDY J. PARKER,  Defendant-Appellant | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

Before: SILER and KETHLEDGE, Circuit Judges; MURPHY, District Judge.[*]

**STEPHEN J. MURPHY, III, District Judge.** In July of 2010, Richland County Children

Services ("RCCS") removed one of its wards from a residential treatment home operated by Alverta

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

Williams. Williams alleges that the decision to remove the individual from the home was representative of a pattern of racially discriminatory behavior by RCCS in its residential placement decisions. To redress her injuries, she brought a variety of civil rights claims against RCCS; its executive director, Randy J. Parker, in his personal and official capacity; and several other defendants. Parker now appeals the district court's denial of his motion to dismiss the 42 U.S.C. § 1981 claim against him in his personal capacity on qualified immunity grounds. Because the complaint states a violation of clearly established rights under federal law, we **AFFIRM**.

I.

A.

Williams is an African-American woman. She owns and manages the Mary McLeod-Bethune Intervention and Enrichment Center ("Center"). The Center provides "housing, supportive services, education, job search training, skill development, intervention and other programs for at risk low and moderate income individuals." Compl. ¶ 4. In May 2009, the Center accepted as a patient "a very difficult, aggressive, young person with special needs who was a ward of [RCCS] and who was refused placement by other agencies." *Id.* ¶ 19. Before allowing her to accept this individual ("Ward"), RCCS asked Williams to "make extensive changes in her staff, policies and procedures . . . including but not limited to establishing an all-male staff and providing mandatory self-defense classes to her employees." *Id.* ¶ 20. The Ward's treatment was "very successful," and Williams benefitted from "substantial payment on the youth's behalf from State and local agencies." *Id.* ¶ 21. Beginning in June or July of 2010, the Ward began "acting out" in such a manner that police had to be called to the Center. *Id.* ¶ 22. On July 20, 2010, RCCS removed the Ward from the Center, and

placed him in another facility in Columbus operated by a Caucasian. *Id.* ¶¶ 23–24. Williams claims she attempted to meet with Parker to discuss this incident and unspecified "other issues," but that he "refused" to meet with her. *Id.* ¶ 25.

Williams named RCCS, Parker, the Richland Newhope Center (a competing residential treatment facility owned by a Caucasian), the Ohio District 5 Area Agency on Aging ("Agency"), and "Jane/John Doe(s)" as defendants in her complaint in the district court. Alongside the specific facts described above, the complaint makes many general allegations that purportedly apply to the "defendants" as a whole. Williams asserts that the defendants "consistently placed only very difficult client[s]" in her homes, while Caucasian-operated homes like Newhope received easier patients. Compl. ¶ 12. The defendants allegedly hold Williams "to stricter operating and other standards" than Caucasians are held to, "including but not limited to being precluded from owning the homes in which her clients are placed." *Id.* ¶ 14. Williams also claims that the defendants provide her with "less than her share of assignment of services" and patients under their control, undermine her business by removing patients "in violation of standard policy," and "discredit her in the community and among her peers." *Id.* ¶¶ 15, 17–18.

## B.

Parker directs our attention to certain features of Ohio law regarding the administration of social services in order to provide a context for Williams's allegations. First, he asserts that RCCS would not need to place an individual in a facility like the Center unless it had custody over "an individual sixteen or seventeen years of age who is eligible for adult services" under Ohio law. Ohio Rev. Code. Ann. § 5126.01(A). Nonetheless, Parker concedes in his brief that he is, "[a]t most . .

. responsible for choosing the provider of services for any individual who is under the care and custody of [RCCS] and who is also eligible for 'adult services' pursuant to Chapter 5126." Appellant's Br. at 16. While Parker maintains that such individuals constitute a "very small subset" of individuals under RCCS's care, he acknowledges that they exist. *Id.* Parker also concedes that the Ward was one of the individuals that fell into this group.

Second, Parker points out that he is not responsible for the licensing and regulation of facilities like the Center, and therefore cannot be held responsible for any irregularities in those processes. Under Ohio law, it is the responsibility of the Ohio Department of Developmental Disabilities ("ODDD") to regulate residential facilities like the Center. *See* Ohio Admin. Code 5123:2-16 & 17. This responsibility includes restrictions on the ownership of such facilities. *See id.* 5123:2-16(H), (I)(12), (I)(14)–(15). Williams responds that these state rules were not applied evenhandedly to her, but there is no plausible allegation in the complaint linking that failure to RCCS, which makes use of facilities like the Center, but does not regulate them.

C.

All defendants filed a motion to dismiss the § 1981 claim asserted by Williams. Because § 1981 does not provide an independent cause of action against units of state government, the district court granted the motion as to RCCS, the Agency, the Richland New Hope Center, and Parker in his official capacity as the executive director of RCCS. *See Arendale v. City of Memphis*, 519 F.3d 587, 594–99 (6th Cir. 2008). But the court denied the motion as to the § 1981 claim against Parker in his personal capacity. It held that Williams's complaint adequately alleged that Parker, as one of the "defendants," treated Williams and the Center differently based on her race, and that his treatment

of her interfered with her ability to make and enforce contracts. The denial of Parker's motion to dismiss the § 1981 claim is the sole issue before us in this appeal.

II.

While an interlocutory order is typically not appealable, the benefit of qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, an order denying qualified immunity is "deemed a final, appealable order" for purposes of 28 U.S.C. § 1291. *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002). We review the district court's denial of Parker's motion to dismiss Williams's § 1981 claim on qualified immunity grounds de novo. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011). Our review is quite limited. "When the qualified immunity defense is raised at the pleading stage, the court must determine only whether the complaint 'adequately alleges the commission of acts that violated clearly established law.'" *Id.* at 681 (quoting *Back v. Hall*, 537 F.3d 552, 555 (6th Cir. 2008)).

The Civil Rules only require Williams to provide "a short and plain statement of the claim showing [she] is entitled to relief" in her complaint. Fed. R. Civ. P. 8. Accordingly, when reviewing a district court's ruling on a motion to dismiss, "we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But under the pleading regime set forth by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556

U.S. 662 (2009), "courts may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). For Williams's complaint to survive, it must be "plausible," meaning that it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If we cannot identify sufficient facts to "nudge[ ] [Williams's] claim[ ] across the line from conceivable to plausible, [her] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III.

To determine Parker's entitlement to qualified immunity, we examine "(1) whether, considering the allegations in a light most favorable to the party injured, a [federal] right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). Parker asks us to consider a third prong that appears in some of our qualified immunity decisions — "whether . . . what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[ ]." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). While we are free to consider this factor if it "increase[s] the clarity of the proper analysis," we are not mandated to do so in a case such as this, where "the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Estate of Carter*, 408 F.3d at 310 n.2.

### A.

Williams's claim against Parker arises under § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to

make and enforce contracts," regardless of race. 42 U.S.C. § 1981(a). The statute defines the phrase "make and enforce contracts" in an open-ended fashion to "include[ ] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

The two major elements of a successful § 1981 claim follow from the statute's language. First, the plaintiff must possess some contractual right that the defendant blocked or impaired. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."). Second, the plaintiff has to demonstrate that racial discrimination drove the decision to interfere with these contractual rights. "We review claims of alleged race discrimination brought under § 1981 . . . under the same standards as claims of race discrimination brought under Title VII . . . ." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 2001).

At this point in the litigation, Williams does not need enough evidence to make out a prima facie case of discrimination as required by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002); *Davis v. Prison Health Servs.*, --- F.3d ---, 2012 WL 1623216, at *5 (6th Cir. May 10, 2012). Under our case law, the plaintiff is only required to "allege[ ] the statutory bases for [her] claim[ ] and . . . set forth the factual predicate of [that] claim[ ]" to move a § 1981 claim past the pleading stage. *Lindsay v. Yates*, 498 F.3d 434, 440 (6th Cir. 2007). *Lindsay* did not squarely confront the issue of whether this standard had been

changed by *Twombly* and *Iqbal*. *See id.* at 440 n.6. Nonetheless, we acknowledged in *Lindsay* that a complaint alleging racial discrimination must possess "sufficient facts giving rise to 'a reasonably founded hope that the discovery process will reveal relevant evidence' to support [the] claims." *Id.* (quoting *Twombly*, 550 U.S. at 559).

The scope of Parker's argument, both in the district court and on appeal, is narrow. Parker does not quarrel with the district court's conclusion that the actions he and the other defendants are accused of constitute the impairment of contractual rights on the basis of racial classifications, in violation of § 1981. Instead, he argues (1) that he did not have the authority to engage in some of the actions, (2) that the allegations are stated in a "vague" or "conclusory" fashion against all "defendants," rather than against him specifically, and (3) that Williams did not have a "clearly established" right to be free from the consequences of his allegedly race-motivated decisions. Principals of judicial economy counsel us not to consider legal theories that were neither presented to the district court nor asserted on appeal. *See McFarland v. Henderson*, 307 F.3d 402, 407 (6th Cir. 2002). Therefore, we assume, for purposes of resolving this appeal, that the district court properly concluded the allegations in the complaint satisfy the elements of § 1981, and limit our consideration to the issues Parker raised on appeal.

B.

Williams's complaint is far from a model of clarity. We agree with Parker that at least two aspects of it are contradictory or implausible. First, while Williams claims that Parker engaged in discrimination by assigning her more challenging cases than Caucasian-owned facilities, this sort of discrimination could only have benefitted her. Williams acknowledges that generous state and

federal funding typically accompanies such assignments, so a placement system that gave the Center more opportunities to take on high-risk individuals would be enhancing, rather than "blocking" or "impairing," her right to enter or maintain contracts. Second, given the structure of Ohio's system for administering social services, there is no plausible basis on which Parker could be held responsible for setting operating standards for the Center. If Williams does have complaints about the licensing and regulation of the Center, she should direct them at the ODDD, and not at Parker.

But the complaint's flaws only serve to detract attention from its core allegations. Williams alleges, and Parker concedes in his brief, that he has legal authority to assign certain individuals for treatment in facilities like the Center in his role as executive director of RCCS. He asserts that such patients are only a "very small subset" of RCCS's overall case load, but that is much different from a situation over which he has *no* responsibility as a matter of law. Williams goes on to state that she receives fewer of these assignments than similarly situated colleagues from different racial backgrounds. When the Center received such a placement — the Ward — the "defendants," including Parker, removed him from the Center and placed him in a Caucasian-operated home. Compl. ¶¶ 23–24. This was done "to utilize the services provided by [Williams] but preclude her from receiving payment for same on the basis of her race." *Id.* at ¶ 28. Construing the complaint in Williams's favor, this event appears to be representative of a pattern of behavior that dates as far back as 1999. RCCS and Parker allegedly took these actions to discredit the Center's competency as a treatment facility, and deprive it of the ability to compete for residential placements on a racially neutral basis.

Parker complains that the allegations are "conclusory" and "vague" insofar as they allege that

the "defendants," generally, committed the unconstitutional acts.[1] *See Brooks v. Am. Broad. Cos.*, 932 F.2d 495, 498 (6th Cir. 1991) (dismissing § 1981 complaint because, among other issues, the plaintiff's "allegations were fatally vague and conclusory in omitting any mention of the laws of which he allegedly was denied the full and equal benefit"). It would be helpful if the complaint were more specific in its allegations, but it is not fatally vague. Parker is the executive director of RCCS, which was in charge of the Ward's assignment to the Center, so the accusations in the complaint can reasonably be attributed to him. This is particularly true in light of his concessions regarding his authority to make certain assignments to residential treatment facilities. Moreover, Williams's allegations are not conclusory in the sense that they are question-begged, insusceptible to empirical verification, or a mere parroting of the elements of a § 1981 claim. *See Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989) (noting that while "the line between 'facts' and 'conclusions' is often blurred," it is generally true that "[c]onclusions . . . are empirically unverifiable" and are "the pleader's reactions to, sometimes called 'inferences from,' the underlying facts"). Finally, the complaint is buttressed by a concrete story about one particular patient, the Ward, whom RCCS assigned to the Center, which greatly alleviates concerns about the level of detail in the complaint.

We find that Williams's complaint, despite its many shortcomings, has enough factual detail to survive the motion to dismiss. The leading case in this circuit on pleading § 1981 claims, *Lindsay*, does not require more detail than what Williams's complaint provides. *See Lindsay*, 498 F.3d at 440

---

[1]Parker does concede that the complaint specifically accuses him of refusing to meet with Williams after RCCS removed the Ward from the Center.

(finding allegations that defendant terminated a purchase agreement with the plaintiffs two weeks after the agreement was signed, and a day after learning plaintiff was African-American, provided a sufficient factual basis to survive a motion to dismiss plaintiffs' § 1981 claim). Read as a whole in the light most favorable to her, the complaint is sufficient to entitle Williams to "a shot at additional factual development, which is what discovery is designed to give [her]." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 281 (6th Cir. 2011). Accordingly, we conclude that the complaint contains sufficient factual detail to survive a motion to dismiss.

## C.

We next examine whether the allegations against Parker constitute a violation of "clearly established" law. It must be "'clear to a reasonable [person] that [Parker's] conduct was unlawful in the situation he confronted.'" *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (quoting *Saucier v. Katz*, 553 U.S. 194, 202 (2001)). While we cannot define "'clearly established' law at a high level of generality," the Supreme Court's qualified immunity precedents do "not require a case directly on point"; they only require that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083–84 (2011).

Parker first argues that the complaint does not allege specifically that he engaged in a violation of "clearly established" law; he was simply one of many "defendants" Williams accused of engaging in unlawful conduct. We have already explained above that the complaint makes out a factually adequate § 1981 claim against Parker. He acknowledged his authority to place individuals like the Ward in treatment facilities, so all of the claims Williams makes about the "defendants'" policies in referring individuals for treatment apply to him with full force. Therefore, we conclude

that the complaint is specific enough to determine whether those actions violate "clearly established" federal norms.

Next, Parker argues that, assuming the complaint is not conclusory or vague, the deprivations Williams claims she has suffered are not "clearly established." Williams has no right, Parker asserts, to a particular share of assignments from RCCS, to receive patients of a certain difficulty level, to meet with him, and so forth. This misses the point. The constitutional harm alleged in this case is not the deprivation of any particular benefit, but the deprivation of enjoying "the same right[s]" to "make and enforce contracts" with RCCS "as is enjoyed by white citizens." 42 U.S.C. § 1981(a). If any "right" under federal law is "clearly established," it is the constitutional right to be free from racial discrimination. Not only is this obligation "clearly established," but it is evident from the face of the statute under which Williams brought her claim. *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) ("[Section 1981] prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors."); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001) (same); *see also Blackwell v. Laque*, 275 F. App'x 363, 367 (5th Cir. 2008) (affirming district court's denial of qualified immunity on a § 1981 claim because "[i]t was clearly established that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination of the sort alleged"). Accordingly, we agree with the district court's finding that Williams's rights are "clearly established."

## IV.

Williams adequately alleged a violation of her rights under § 1981 by Parker, and her rights under that statute were "clearly established" when the events described in the lawsuit took place.

We find that Parker is not entitled to qualified immunity, and **AFFIRM** the order of the district

court.