**MIKE VAUGHN CUSTOM SPORTS, INC., Plaintiff,**

v.

**Chrystem "Chris" PIKU, Piku Management Co. d/b/a Worldpro Goaltending—USA, Dennis Dombrowski, and Factory Modification and Design, LLC, Defendants.**

**Case No. 12–13083.**

United States District Court, E.D. Michigan, Southern Division.

Signed April 25, 2014.

Bruce A. Vande Vusse, Brian J. Renaud, Michael R. Blum, Foster Swift Collins & Smith PC, Farmington Hills, MI, for Plaintiff.

Arnold S. Weintraub, Elana H. Gloetzner, Law Offices of Elana Weintraub Gloetzner, PLC, Southfield, MI, for Defendants.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS BY DEFENDANTS PIKU AND PIKU MANAGEMENT COMPANY

DAVID M. LAWSON, District Judge.

Plaintiff Mike Vaughn Custom Sports, Inc. manufacturers ice hockey equipment for goaltenders who play the sport at all levels. The plaintiff filed a complaint alleging that Dennis Dombrowski, a former employee, stole design, product, and customer information, formed defendant Factory Modification and Design, LLC as a competing business, and conspired with the other defendants to use the purloined information to manufacture and sell competing products. The plaintiff filed a fourteen-count complaint, later amended, seeking damages and equitable relief. Presently before the Court is a motion by defendants Piku Management Company and its president, Chrystem "Chris" Piku, to dismiss counts I (trade dress infringement), II (trademark dilution and false promotion of goods), III (false designation of origin), IV (trade dress dilution), IX (breach of duty of loyalty), and X (breach of fiduciary duty) of the amended complaint for failure to state a claim. The Court heard oral argument on November

7, 2013, and now concludes that the plaintiff has not pleaded sufficient facts to support its claims in counts I, II, or IV, but the amended complaint adequately states claims in counts III, IX, and X. Therefore, the motion to dismiss will be granted in part and denied in part.

I.

According to the plaintiff, Mike Vaughn Custom Sports, Inc. is a Michigan corporation that designs, manufactures, and sells custom goaltender equipment for professional, collegiate, high school, and amateur hockey players. Defendant Dennis Dombrowski is a former employee of Vaughn Sports. Defendant Piku Management Company is the former retail sales agent for Vaughn Sports products, and defendant Chrystem "Chris" Piku is the President and Chief Executive Officer of Piku Management. Defendant Factory Modification and Design, LLC is a company owned by Dombrowski that manufactures catch gloves, blocker gloves, leg pads, and knee guards for goalies.

The plaintiff alleges that it is a "recognized industry leader" in the design, manufacture, and sale of custom goaltender equipment, Am. Compl. ¶ 20, having developed a famous brand identity and reputation internationally, with sales of its products in the United States, Canada, South America, Europe, and Asia. The plaintiff's product line-up includes hockey goalie pads, catch gloves, arm and chest pads, goal masks, goal pants, goal sticks, goal cups, goal bags, and related accessories. The plaintiff alleges that it developed a signature trade dress for its goalie pads, goalie catch glove, and other products, which it describes as the "Vaughn Trade Dress," id. ¶ 22, although it has not said exactly what that is.

Dombrowski worked for Vaughn Sports from February 12, 1987 through June 20, 1994 in various capacities, including as a production manager. The plaintiff fired him on November 12, 2010. During his employment, Dombrowski had access to the plaintiff's confidential business information and trade secrets, including the plaintiff's product design specifications, logos, customers, customer contact information, customer-preferred product design specifications, lists of raw materials suppliers and their pricing information, inventory on hand, and other protected business information.

The plaintiff alleges that Dombrowski knew about the plaintiff's policies prohibiting: (1) the removal of company property from Vaughn Sports facilities without authorization; (2) bringing unauthorized visitors into the Vaughn Sports Facility; and (3) using the plaintiff's company telephone lines for non-business communications, including with direct business competition. Nevertheless, the plaintiff says that Dombrowski engaged in multiple lengthy telephone calls on the company telephone lines with Peter Smith, owner of Smith Hockey, Inc., a direct competitor of Vaughn Sports. Smith also is a former employee of the plaintiff, worked with Dombrowski, and created a website following his departure selling hockey goaltender products that are identical in design to the products that Vaughn Sports manufactures. Vaughn Sports believes that Dombrowski helped Smith establish the competing business while Dombrowski worked as an employee at Vaughn Sports. The purpose of the phone calls was to share the plaintiff's confidential business information and trade secrets and to assist Smith in developing his competing business.

The plot came to light, according to the plaintiff, in January 2012, when Yellow Freight Lines, a common carrier, mistakenly delivered to the Vaughn Sports manufacturing facility, "c/o Dennis

Dombrowski," a large hydraulic press machine specifically to manufacture hockey goaltender equipment. The plaintiff alleges that Dombrowski, acting in concert with Smith, Piku, and Piku Management, acquired the hydraulic press to manufacture infringing competitive hockey goaltender products that are identical in design, or confusingly similar to, Vaughn Sports' goaltender products and based on Vaughn Sports' confidential business information, trade dress, and trade secrets.

Before he was fired, Dombrowski, without company authorization, instructed subordinate level production employees to suppress or slow production of Vaughn Sports goalie pads that had been ordered or that were part of a normal production run. Dombrowski did this, says the plaintiff, so that he and other defendants could develop and market their competing hockey goaltending products. He also instructed subordinate level production employees to re-cut or duplicate sections and other pieces of Vaughn Sports goalie pads despite not having any customer orders or other instructions for the re-cutting. Dombrowski mailed those items to Piku and Piku Management in furtherance of their plans to develop and market competing products using Vaughn Sports' trade dress, trade secrets, and confidential business information.

Before Dombrowski left, his employee personnel file and the Vendor Book from Vaughn Sports premises went missing. The amended complaint alleges that Dombrowski removed them or arranged to have them removed. The Vendor Book contained vendor source information for every raw material purchased by Vaughn Sports, the material specification and material item number relating to the vendor, the quantities normally ordered, and the prices paid by Vaughn Sports to vendors for the material. The plaintiff believes that Dombrowski removed the Vendor Book or arranged for its disappearance in furtherance of his joint plan with Piku or Piku Management to develop and market competing products.

Also before Dombrowski was fired, the Vaughn Sports "Master Inventory Book" went missing. The Mastery Inventory Book contained a listing of Vaughn Sports' product inventory on hand, a description of each production job step for each Vaughn Sports product, and the amount of worker time allocated to each production step. That information, along with the Vendor Book, would allow someone to obtain costs for the production of competing products identical to Vaughn Sports. The amended complaint alleges that Dombrowski removed the Master Inventory Book or arranged with Piku Management to remove it, as part of their joint plan to develop and market competing products using Vaughn Sports's trade dress, trade secrets, and confidential business information.

Defendants Piku and Piku Management sold Vaughn Sports products through a goaltender training school called "Worldpro Goaltending—USA" that Piku operated under the auspices of Piku Management. Vaughn Sports financially sponsored the training school until September 2010. Vaughn Sports terminated the sales relationship around September 2010 because Piku and Piku Management failed to maintain a store front, as required by Vaughn Sports policy; keep regular business hours; carry reasonable inventory of Vaughn Sports stock; solicited and accepted orders for Vaughn Sports products with product fit and design modifications that were illegal within the hockey industry; made direct modification to the National Hockey League player's Vaughn Sports goalie equipment, in violation of NHL rules that any pro-

posed modification be pre-approved by the NHL; sold Vaughn Sports products directly to a Canadian hockey equipment dealer that was not an authorized Vaughn Sports dealer, in violation of Vaughn Sports policy; overcharged customers for Vaughn Sports products and falsely represented to those customers that Vaughn Sports imposed those charges; and falsely represented to customers that certain product modifications were his designs, even though Vaughn Sports made the modifications.

The amended complaint alleges that Dombrowski and Piku regularly worked together in the production and outside sale of Vaughn Sports products prior to his termination. Dombrowski regularly allowed Piku to enter the manufacturing areas of Vaughn Sports' facilities, visually inspect and handle the plaintiff's goaltender products, and review and inspect Vaughn Sports' production machinery and processes. The purpose of these joint inspections was to copy know-how on the machinery, tools, process and procedures necessary to manufacture goal equipment, and to copy Vaughn Sports's trade dress and product designs.

The plaintiff alleges that Piku and Dombrowski contacted the plaintiff's long-standing professional goaltender customers to solicit them to purchase purported "Piku" custom goalie equipment. Dombrowski also established an offsite manufacturing facility, in which multiple items of Vaughn Sports equipment, including pads and catch gloves, were modified or reconstructed. The plaintiff alleges that these products were converted into or served as the basis for the production of purported "Piku" pads and "Piku" catch gloves, among other infringing products.

Around September 2011, photographs in print and electronic media publications showed Boston Bruins goalie Tim Thomas wearing purported "Piku" goalie pads and a purported "Piku" catch glove. The plaintiff says that the glove, designs, profiles, and trade dress are all identical to the designs used by Vaughn Sports under the Vaughn Sports brand. The plaintiff contends that Piku admitted that he used "Vaughn Covers" for the Piku pads, removed the "Vaughn" brand name from them before providing them to Tim Thomas, and passed off Vaughn products as his own. Several publications attributed the design and manufacture of the pads and catch glove to a collaboration between Piku, the designer, and Dombrowski, the manufacturer. The amended complaint also alleges that Piku passed Vaughn Sports' goalie pads as their own by attaching the name "Worldpro Goaltending" to the pads.

The plaintiff alleges that the defendants have expanded and marketed their line of infringing products, including through the Internet, which diminishes the status of the Vaughn trade dress as a unique identifier of the Vaughn brand. The plaintiff says that these acts of trade dress infringement, trademark dilution, interference, breaches of duty, and other wrongful acts have created market confusion and economic loss to Vaughn Sports. Drawing on those allegations, the plaintiff filed an amended complaint setting out the following claims: Count I—Trade dress infringement (all defendants) under 15 U.S.C. § 1125(a)(3); Count II—Trademark dilution and false promotion of goods (all defendants) under 15 U.S.C. § 1125(a)(1)(B); Count III—False designation of origin (all defendants) under 15 U.S.C. § 1125(a)(1)(A); Count IV—Trade dress dilution (all defendants) under 15 U.S.C. § 1125(c); Count V—Common law unfair competition and trade dress infringements (all defendants); Count VI—Michigan Uniform Trade Secrets Act violation (all de-

fendants) under Mich. Comp. Laws § 445.1901; Count VII—Breach of duty of loyalty (Dombrowski); Count VIII—Breach of fiduciary duty (Dombrowski); Count IX—Breach of duty of loyalty (Piku and Piku Management); Count X—Breach of fiduciary duty (Piku and Piku Management); Count XI—Business defamation (all defendants); Count XII—Intentional interference with contract and business advantage (all defendants); Count XIII—Civil Conspiracy (all defendants); and Count XIV—Accounting.

## II.

Defendants Piku and Piku Management argue that counts I, II, III, IV, IX, and X are defective because they fail to state claims for which relief can be granted, and therefore they should be dismissed under Federal Rule of Civil Procedure 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir.2001) (citing *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008). "[A] judge may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations." *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 228–29 (6th Cir.1997) (quoting *Columbia Nat'l Res., Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995)). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Tatum,* 58 F.3d at 1109; *Tackett v. M & G Polymers, USA, L.L.C.,* 561 F.3d 478, 488 (6th Cir.2009).

To survive a motion to dismiss, [a plaintiff] must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the "sheer possibility" of relief but less than a "probab[le]" entitlement to relief. *Ashcroft v. Iqbal,* [556 U.S. 662, 678], 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Fabian v. Fulmer Helmets, Inc.,* 628 F.3d 278, 280 (6th Cir.2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

Under the new regime ushered in by *Twombly* and *Iqbal,* pleaded facts must be accepted by reviewing courts but conclusions may not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements' " of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal,* 556 U.S. at 681, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). However, as long as a court can " 'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian,* 628 F.3d at 281 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

### A. Count I (Trade Dress Infringement) and Count IV (Trade Dress Dilution)

The Piku defendants argue that the plaintiff has not pleaded sufficient facts to support the allegations in count I that the

plaintiff's products are distinctive, have acquired secondary meaning, and that the plaintiff's trade dress is non-functional, and the plaintiff failed to identify its alleged trade dress with any specificity. These defendants also argue that count IV should be dismissed because there is no cause of action under the Trade Dilution Revision Act (TDRA) for trade dress dilution. They contend that 15 U.S.C. § 1125(c) pertains only to the owner of a famous mark, trade dress is not a trademark, and section 1125(c) cannot be expanded to include trade dress in its interpretation of the TDRA.

■ "Trade dress refers to the image and overall appearance of a product." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir.2002) (internal quotation marks omitted). "It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983)). Section 1125(a)(3), Title 15 of the United States Code protects unregistered trade dress from infringement. A party must plead three elements to state a trade dress infringement claim based on product design: (1) the trade dress is protectable; (2) there is a likelihood of confusion between the defendant's trade dress and the plaintiff's trade dress; and (3) the features of the trade dress are primarily non-functional. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 308 (6th Cir.2001).

■ On the first element, trade dress based on product design is protectable if the trade dress has acquired secondary meaning. *Ibid.* Courts have exercised

"particular 'caution,' when extending protection to product designs." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir.2001) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir.1997)). Trade dress claims based on product design raise a "potent risk" that relief will hamper efforts to market competitive goods; create a monopoly in the goods themselves rather than a word, phrase, or symbol; and undermine restrictions in copyright and patent law that are designed to avoid granting monopolies to products and ideas. *Id.* at 115.

■ To claim protection, a plaintiff must identify the features in its product that comprise its trade dress. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997). The defendants argue that the amended complaint is deficient because it does not identify the plaintiff's trade dress with particularity. The plaintiff argues that it is not required to do so, relying on two cases that pre-date *Iqbal* to support its argument: *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir.2002) (stating that the complaint "merely puts the defendant on notice of the plaintiff's claims"); and *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 635 F.Supp.2d 632, 641 (E.D.Mich.2008) (stating that if the complaint gives notice, "there is no requirement that Plaintiff plead its trade dress claim with further specificity"). However, those cases do not reflect the current understanding of Federal Rule of Civil Procedure 8's requirements. After *Iqbal*, a plaintiff must plead sufficient facts in the complaint to support each element of its cause of action.

■ To allege that trade dress is protectable, "plaintiffs should detail 'exactly what the[ir] trade dress consists of.'" *Fair Wind Sailing, Inc. v. Dempster*, 2013

WL 1091310, at *4 (D.Vi. Mar. 15, 2013) (quoting *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 416 (6th Cir. 2006)). "Vague allegations that a defendant 'uses' protected trade dress are not enough." *Myung Ga, Inc. v. Myung Ga of MD, Inc.*, 2011 WL 3476828, at *5 (D.Md. Aug. 8, 2011). "A plaintiff must . . . offer a precise expression of the character and scope of the claimed trade dress . . . and articulate the 'elements of their product design with specificity to be afforded trade dress protection.'" *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 2013 WL 1209041, at *12 (E.D.N.Y. Mar. 25, 2013) (quoting *Shevy Custom Wigs, Inc. v. Aggie Wigs.*, 2006 WL 3335008, at *4 (E.D.N.Y. Nov. 17, 2006)). "[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir.2006) (quoting McCarthy on Trademarks § 8:3 (4th ed.2001)).

 The plaintiff alleges that it developed a "signature trade dress feature" for its "goalie pads," "goalie catch glove," and "other of its products" and that these products feature "non-functional elements." Am. Compl. at ¶ 22. The plaintiff calls this "trade dress feature" the "Vaughn Trade Dress." *Ibid.* Even under the reasoning of *Innovation Ventures, LLC*, those allegations are insufficient to provide the defendant notice as to the plaintiff's trade dress, which products the defendant infringed, and what aspect of the plaintiff's trade dress the defendant infringed. *See Montblanc–Simplo GmbH v. Colibri Corp.*, 692 F.Supp.2d 245, 255 (E.D.N.Y.2010) ("A plaintiff claiming trade dress infringement as to a line of products must make efforts to fairly put the defendant on notice of the distinctive elements and features of the trade dress."); *see also Sleep Sci. Partners v. Lieberman*, 2010 WL 1881770, at *3 (N.D.Cal. May 10, 2010) (granting a motion to dismiss a "look and feel" trade dress claim because the plaintiff failed to articulate clearly the elements comprising the website's "look and feel," which provided inadequate notice of the plaintiff's allegations and raised a question as to whether the plaintiff intended to redefine its trade dress at a future stage of litigation). Nor can this Court "evaluate secondary meaning, overbreadth, or non-functionality without knowing precisely what the plaintiff is trying to protect." *Yurman Design, Inc.*, 262 F.3d at 116.

 The lack of specificity presents another problem. The plaintiff must plead that the trade dress is non-functional. *Herman Miller, Inc.*, 270 F.3d at 308. " '[A] product feature is functional' and cannot serve as a trademark [or protectable trade dress], if it is essential to the use or purpose of the article or it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). "A functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *Ibid.* "[T]he nonfunctionality requirement 'protects competition even at the cost of potential consumer confusion.'" *Yurman Design, Inc.*, 262 F.3d at 116 (quoting *Landscape Forms*, 113 F.3d at 379–380).

 As a general matter, "[i]n a trade dress infringement case, the determination of functionality is a question of fact." *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 933 F.Supp.2d 974, 1012 (S.D.Ohio 2013) (quoting *Market Masters, Inc. v. Clinician's Choice Dental Products, Inc.*, 99 Fed. Appx. 677, 681 (6th Cir.2004)). However, "[t]he failure to plead non-functionality

with factual particularity establishes merely the possibility and not the plausibility of [relief] and is therefore fatal to Plaintiff's trade dress claim." *ID7D Co., Ltd. v. Sears Holding Corp.*, 2012 WL 1247329, at *7 (D.Conn. Apr. 13, 2012). The plaintiff alleges that Vaughn Sports "developed a signature trade dress feature . . . featuring non-functional elements." Am. Compl. at § 22. Those allegations are conclusory and therefore not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 663, 129 S.Ct. 1937. And the complaint contains no factual allegations otherwise supporting this element; to the contrary, the plaintiff's exhibits describe the plaintiff's products in entirely functional terms. *See* dkt. # 1–1. For example, the text accompanying the image of "VPG 8606 Epic" goal pad, contained in exhibit A, describes the functional purposes of the goal pad's design features:

> The "flat front design . . . reduce[s] rebounding and . . . provide[s] added puck control . . . A knee hugger . . . reduce[s] openings . . . while going down to the ice . . . Large square shaped outside roll prevents puck skip . . . the square frontal shape increase[s] the overall blocking surface . . . Full pro style knee cradle design . . . provides superior performance . . . full legal cradle design . . . adds stability and balance while on the ice.

Compl. Ex. A [dkt. # 1–1]. Even the description of the graphics describe the design as functional, concluding that the plaintiff designed the graphics to provide "increased durability" and "superior performance." *Ibid.* The Court cannot evaluate what the plaintiff considers non-functional if the only factual allegations describe the product design's myriad functional purposes. *See DO Denim, LLC v. Fried Denim, Inc.*, 634 F.Supp.2d 403, 408 (S.D.N.Y.2009) (dismissing the plaintiff's trade dress infringement and trade dress dilution claims because the plaintiff's complaint did not plead with specificity the non-functional aspects of the plaintiff's product design).

The plaintiff alleges that the complaint is sufficient because it attached photographs comparing its products and the defendants' allegedly infringing products. Those photographs certainly may be considered in a Rule 12 motion. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir.2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). But they do not help the plaintiff's claim. "[C]ourts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." *Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC*, 601 F.Supp.2d 556, 562–63 (S.D.N.Y. 2009). "[I]mages alone do not satisfy the plaintiff's obligation to articulate the distinctive features of the trade dress." *Heller Inc. v. Design Within Reach, Inc.*, 2009 WL 2486054, at *6 (S.D.N.Y. Aug. 14, 2009). The images do not rescue plaintiff's trade dress claim because the Court cannot distill from the images what the plaintiff claims as protected trade dress or identify what is non-functional about its product design. Count I must be dismissed for failure to state a claim upon which relief can be granted.

The same problem plagues count IV, alleging trade dress dilution. (The defendants say there is no such cause of action under 15 U.S.C. § 1125(c), but that is plainly incorrect; it is well-established that "[t]rade-dress dilution is actionable under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 519 (6th Cir.2013).) To state such a claim, the plaintiff must plead that (1) the senior mark is famous; (2) it is

distinctive; (3) the defendants used the junior mark in commerce; (4) they did so after the senior mark became famous; and (5) that use caused dilution of the distinctive quality of the senior mark. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir.2004). The plaintiff alleges that the Vaughn Trade Dress is famous and distinctive in the minds of consumers, the defendants misappropriated the Vaughn Trade Dress to promote their own infringing products in interstate commerce, and diluted the distinctiveness of the Vaughn Trade Dress. Am. Compl. §§ 86–87. Those allegations are conclusory and not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937.

As with the infringement count, the Court cannot evaluate the plaintiff's claim for trade dress dilution because the complaint does not identify with precision the plaintiff's claimed trade dress. " 'Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market.' " *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir.2006) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir.1997)). Further, "courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Landscape Forms, Inc.*, 113 F.3d at 381. Finally, "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea." *Ibid.*

Nor is the amended complaint sufficient to assess nonfunctionality, or to suggest a plausible claim that the plain-

tiff's trade dress is famous. "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. 1125(c)(2)(A). The cause of action protects a "select class of marks" from a limited number of nationally recognized companies with a "household name." *Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F.Supp.2d 657, 674 (W.D.Tex. 2008) (University of Texas presented insufficient evidence to demonstrate that its football team's logo was famous enough to entitle it to anti-dilution protection). "One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like." *Id.* at 679. There is no cause of action for trade dress dilution for products based on "niche fame, *i.e.* fame limited to a particular channel of trade, segment of industry or service, or geographic region." *Luv N' Care, Ltd. v. Regent Baby Products Corp.*, 841 F.Supp.2d 753, 757–58 (S.D.N.Y.2012) (dismissing trade dress dilution claim because the plaintiff, a manufacturer of baby products, failed to plead sufficient facts to support assertion that marks associated with baby products were recognized beyond a niche market, the baby product market). Congress did not intend "to confer on marks that have enjoyed only brief fame in a small part of the country or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce. The examples of eligible "famous marks" given in the [legislative history]—Dupont, Buick, and Kodak—are marks that for the major part of the century have been household words throughout the United States. They are representative of the best known marks in com-

merce." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001).

The plaintiff alleges that it has developed a "famous brand identity, reputation and sales distribution of its products internationally, including in the United States, Canada, South America, Europe and Asia, among other places." Am. Compl. § 20. Perhaps, but these allegations are not sufficient to establish that the plaintiff's trade dress is famous beyond a niche sports market. *Compare Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030, at *5–6 (E.D.Cal. Sept. 18, 2007) (mark famous because Nike "had spent in excess of a billion dollars for promotion of NIKE products in the United States," sales of NIKE products had earned at least $1 billion per year, "recognition of the success of NIKE has been recorded by various publications in surveys and articles," and "the NIKE mark is registered on the PTO's principal register") and *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir.2008) ("Here, a reasonable trier of fact could conclude that the HOT WHEELS mark is famous: it has been in use for over thirty-seven years; 350 million dollars have been expended in advertising the mark; three billion HOT WHEELS units have been sold since the inception of the mark; and HOT WHEELS are sold in all fifty states and throughout the world.") with *Bd. of Regents, Univ. of Texas Sys.*, 550 F.Supp.2d at 677–78 (W.D.Tex.2008) (evidence that University of Texas (UT) football games are nationally televised on ABC and ESPN; the 2006 Alamo Bowl game between UT and the University of Iowa was the most watched bowl game in ESPN's history; between 1963 and 2006, UT football players have been featured solely or as a part of the cover of Sports Illustrated ten times; the team's football helmet has been displayed on two separate Wheaties' boxes; retail sales of UT products totaled nearly $400 million in 2005–06; and Forbes recently valued UT's football program as the second most valuable in the country was insufficient to establish that the university's logo was "famous" under the terms of the statute).

Count IV of the amended complaint fails to state a plausible claim of trade dress dilution.

## B. Count II (Trademark Dilution)

The plaintiff titled count II as a claim for "trademark dilution (The Lanham Act, 15 USC § 1125(a)(1)(B)) false promotion of goods." Am. Compl. at 14. Trademark dilution and false promotion of goods are two distinct causes of action. It is not clear which the plaintiff intended to plead. The statute cited in the complaint and the factual allegations in the complaint are relevant to a cause of action for the false promotion of goods. However, the parties' motion papers, including the plaintiff's response, only address trademark dilution. This is confusing, because the amended complaint does not even allege that the plaintiff registered any trademarks.

To state a trademark dilution claim, the plaintiff must allege that "(1) the senior mark [is] famous; (2) it [is] distinctive; (3) the junior use [is] a commercial use in commerce; (4) it [ ] beg[a]n after the senior mark has become famous; and (5) it [ ] cause[d] dilution of the distinctive quality of the senior mark." *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 468–69 (6th Cir.2001) *rev'd on other grounds*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). The defendants say that count II must be dismissed because the plaintiff does not allege that he registered any trademarks or that the defendants violated any trademarks. They are correct. The plaintiff points out that it owns three reg-

istered trademarks, but that statement comes in its motion response. The *complaint* only contains a single sentence relevant to trademarks: "This [complaint] is an action for . . . trademark dilution." Am. Compl. ¶ 17. The complaint does not contain any factual allegations—or even conclusory facts—to support a trademark dilution claim.

 But count II also suggests a claim for the false promotion of goods under 15 U.S.C. § 1125(a)(1)(B). That statute reads:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A claim under that statute is well pleaded if the complaint alleges that: (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *Herman Miller, Inc.*, 270 F.3d at 322–23.

The amended complaint here alleges that the defendants promoted infringing products to various customers and potential customers; misrepresented the nature, characteristics, and qualities of plaintiff's goods, services, and commercial activities; and this promotion was likely to mislead and confuse customers and the public. Am. Compl. ¶¶ 75–77. These are "[t]hreadbare recitals of the elements of [the] cause of action" and "do not suffice." *Iqbal,* 556 U.S. at 662, 129 S.Ct. 1937. But even if we accept those conclusions as true, they do not state a claim under section 1125(a)(1)(B). The thrust of the plaintiff's allegations is that the defendant marketed and sold products under the Piku label that the plaintiff actually designed. Am. Compl. ¶¶ 44(h), 49, 50. "[F]alse attribution of the authorship of an invention or innovation is not an actionable false advertisement under § 43(a)[(1)(B)] of the Lanham Act." *Robert Bosch LLC v. Pylon Mfg. Corp.,* 632 F.Supp.2d 362, 366–67 (D.Del.2009); *see also Sweet St. Desserts, Inc. v. Better Bakery, LLC,* 2013 WL 81385, at *4 (E.D.Pa. Jan. 7, 2013) ("False attribution of the authorship of an invention or innovation is not an actionable false advertisement under § 43(a)[(1)(B)] of the Lanham Act."); *Romero v. Buhimschi,* 396 Fed.Appx. 224, 233 (6th Cir.2010) (suggesting that a section 43(a)(1)(B) claim must relate to the "nature, characteristics, qualities, or geographic origin" of a product and not authorship); *Baden Sports, Inc. v. Molten USA, Inc.,* 556 F.3d 1300, 1307 (Fed.Cir.2009) ("[W]e conclude that authorship, like licensing status, is not a nature, characteristic, or quality, as those terms are used in Section 43(a)(1)(B) of the Lanham Act."); *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1144 (9th Cir.2008) (holding that authorship is not a characteristic or quality sufficient to state a claim under § 43(a)(1)(B) of the Lanham

Act; this avoids overlap between the Lanham and Copyright Acts).

Count II of the amended complaint will be dismissed.

### C. Count III (False Designation of Origin)

 The Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin ... of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). A claim under this statute requires a plaintiff to allege that (1) the false designation had a substantial economic effect on interstate commerce; and (2) the false designation created a likelihood of confusion. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998) (citing *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790, 795 (6th Cir.1957)). The Piku defendants argue that the plaintiff has not pleaded enough facts to show likely confusion.

 What the plaintiff has alleged is that defendants violated 15 U.S.C. § 1125(a)(1)(A) by manufacturing products that the plaintiff designed and calling them their own. Am. Compl. ¶¶ 81–83. But that allegation does not support a cause of action for a false designation of origin under the Lanham Act. The phrase "origin of goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not the to author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). If a defendant produced the plaintiff's goods and sold them as its own, the plaintiff cannot prevail on a false designa-

tion of origin claim. *Mertik Maxitrol GMBH & Co. KG v. Honeywell Technologies SARL*, 2012 WL 748304, at *5 (E.D.Mich. Mar. 6, 2012) (citing *Dastar Corp.*, 539 U.S. at 38, 123 S.Ct. 2041). "Taking tangible goods and reselling them as your own constitutes a Lanham Act violation; taking the intellectual property contained in those goods and incorporating it into your own goods does not." *Nat'l Bus. Dev. Servs., Inc. v. Am. Credit Educ. & Consulting, Inc.*, 299 Fed.Appx. 509, 511 (6th Cir.2008) (citing *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149 (5th Cir. 2004)); *see also Zyla v. Wadsworth, Div. of Thomson Corp.*, 360 F.3d 243, 251–52 (1st Cir.2004); *Romero v. Buhimschi*, 396 Fed.Appx. 224, 232 (6th Cir.2010) (holding that plaintiffs did not state a cause of action for false designation of origin even if the defendant failed to credit their co-authorship of a manuscript).

 There are, however, other allegations in count III that support a claim under section 1125(a)(1)(A). The plaintiff also alleges that the defendants removed the "Vaughn" brand name from products or attached the name "Worldpro Goaltending" to Vaughn Sports goalie pads, thereby passing them off as their own. Amend. Compl. ¶¶ 52, 54. Those allegations are sufficient to state a false designation of origin claim. "Few are the cases demonstrating a more obvious and imminent likelihood of confusion." *Johnson*, 149 F.3d at 503. Those allegations in count III state a viable claim under the Lanham Act.

### D. Count IX (Breach of Duty of Loyalty)

 The Piku defendants contend that a prerequisite to liability under Michigan common law for breach of the duty of loyalty is an employment relationship. The premise of that argument is flawed.

"Under principles of agency, an agent owes his principal a duty of good faith, loyalty, and fair dealing." *H.J. Tucker & Associates, Inc. v. Allied Chucker & Eng'g Co.*, 234 Mich.App. 550, 574, 595 N.W.2d 176, 188 (1999) (citing *Burton v. Burton*, 332 Mich. 326, 337, 51 N.W.2d 297 (1952)). "The Michigan courts have held that an agent of a principal owes a fiduciary obligation to the principal not to appropriate the opportunity of the principal for his own benefit." *United Rentals (N. Am.), Inc. v. Keizer*, 202 F.Supp.2d 727, 743 (W.D.Mich. 2002) (citing *Central Cartage Co. v. Fewless*, 232 Mich.App. 517, 591 N.W.2d 422, 426 (1998)). "[T]he law will not permit an agent to act in a dual capacity in which his interest conflicts with his duty, without a full disclosure of the facts to his principal." *Sweeney & Moore v. Chapman*, 295 Mich. 360, 363, 294 N.W. 711, 712–713 (1940). "Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition." *In re Sullivan*, 305 B.R. 809, 819 (Bankr.W.D.Mich. 2004).

The amended complaint alleges that the defendants planned and prepared to engage in a competing business during the scope of their agency relationship with the plaintiff. Am. Compl. ¶¶ 35, 36, 37, 40, 41, 42, 43, 46, 48. By themselves, those allegations do not state a claim for a breach of the duty of loyalty. *See In re Sullivan*, 305 B.R. at 819; *Meyers v. Roger J. Sullivan Co.*, 166 Mich. 193, 196, 131 N.W. 521, 522 (1911) (planning by an employee during his contract of employment to engage in a competing business is not a breach of the duty of loyalty). However, the amended complaint also alleges that the defendants actually commenced competition with the plaintiff's products: the plaintiff says that the defendants made contact with the plaintiff's customers and prospective customers to solicit them to purchase "Piku" custom goalie equipment; they established an offsite manufacturing facility to produce competing products; and they falsely represented to customers that certain product modifications were their designs when they were in fact designed by Vaughn Sports. Amend. Compl. ¶¶ 44, 49, 50. Those allegations of direct competition are sufficient to state a claim for breach of the duty of loyalty. *See Chem-Trend Inc. v. McCarthy*, 780 F.Supp. 458, 460 (E.D.Mich.1991) (explaining, in granting a preliminary injunction request, that although the "mere planning and preparation" to engage in a competing business did not constitute a duty of loyalty, an employee who distributed his competing product to customers for testing, entered the products in trade shows, and sold the product to his employer's customers did more than just prepare; he breached his duty of loyalty).

■■■■ The defendants also argue that defendant Piku, as an independent retailer, did not have an agency relationship with the plaintiff. However, the plaintiff alleges that "Piku Management, through its President, Piku, served as an outside retail sales agent for Vaughn Sports products" from January 15, 2009 to September 2010. Am. Compl. ¶ 13. The defendants held inventory of Vaughn Sports stock, solicited and accepted orders for Vaughn Sports products, and sold Vaughn Sports products. Am. Compl. ¶ 44. Those allegations state facts from which an agency relationship can be inferred. "[W]here there is a disputed question of agency, any evidence, either direct or inferential, which tends to establish an agency relationship creates a question of fact for the jury to determine." *Vargo v. Sauer*, 457 Mich. 49, 71, 576 N.W.2d 656, 666 (1998). "[T]he existence

of an agency relationship and the scope of the relationship are questions of fact." *Global Tech., Inc. v. Moto Diesel Mexicana,* 2007 WL 1500178, at *12 (E.D.Mich. May 22, 2007). The Court cannot resolve questions of fact on a motion to dismiss. *See Koehring Co. v. A.P.I., Inc.,* 369 F.Supp. 882, 891 (E.D.Mich.1974); *Bowens v. Aftermath Entm't,* 254 F.Supp.2d 629, 640 (E.D.Mich.2003); *In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618, 681 (E.D.Mich.2000).

 The defendants also argue that a claim for breach of the duty of loyalty is preempted by the Michigan Uniform Trade Secret Act (MUTSA). Section 8 of the Act says that the law "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Mich. Comp. Laws § 445.1908(1). But that preemption does not extend to "[o]ther civil remedies that are not based upon misappropriation of a trade secret." *Id.* § .1908(2). "The MUTSA does not displace contractual remedies, other civil remedies that are not based upon misappropriation of a trade secret, or criminal remedies." *Lube USA Inc. v. Michigan Mfrs. Serv. Inc.,* 2009 WL 2777332, at *8 (E.D.Mich. Aug. 27, 2009).

 The allegations in count IX have little to do with trade secrets. "A claim for breach of fiduciary duty and breach of duty of loyalty is really the opposite of a misappropriation claim in that it is the agent or employee that withholds information or conceals activity of his own when the relationship gives rise to a duty to disclose, whereas the essence of a misappropriation claim is the theft of the employer's information." *Wysong Corp. v. M.I. Indus.,* 412 F.Supp.2d 612, 623–24 (E.D.Mich.2005). The gravamen of count IX is that the Piku defendants were competing against the plaintiff without disclos-

ing their activities as they should. The plaintiff's claim in this count is not based principally on the misappropriation of trade secrets. Count IX therefore is not preempted by the MUTSA.

### E. Count X (Breach of Fiduciary Duty)

 The defendants say that the amended complaint does not allege that Piku had a fiduciary relationship with the plaintiff. The Court disagrees. "Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *Calhoun Cnty. v. Blue Cross Blue Shield Michigan,* 297 Mich. App. 1, 20, 824 N.W.2d 202, 213 (2012). "An agent authorized to buy or sell for his principal cannot buy or sell for himself; nor can an agent take advantage of the knowledge acquired of his principal's business to make profit for himself at his principal's expense." *Pikes Peak Co. v. Pfuntner,* 158 Mich. 412, 416, 123 N.W. 19, 20–21 (1909). " '[I]f an agent acquires any pecuniary advantage to himself from third parties by means of his fiduciary character, he is accountable to his employer for the profit made.' " *Silberstein v. Pro–Golf of Am., Inc.,* 278 Mich.App. 446, 458, 750 N.W.2d 615, 624 (2008) (quoting *Central Cartage Co. v. Fewless,* 232 Mich.App. 517, 525, 591 N.W.2d 422 (1998)).

 The plaintiff alleges that Piku and Piku Management acted as an outside agent of the plaintiff and held a position of

trust and confidence. Am. Compl. ¶ 115. The plaintiff alleges that the defendants breached their fiduciary duties by falsely telling customers that they could get certain product modifications made only if Piku modified them; falsely representing to customers and others that certain product modifications were Piku's designs; copying Vaughn Sports' product designs for their own economic benefit; making direct contact with the plaintiff's customers to solicit them to purchase Piku products; and passing off Vaughn Sports' products as their own. *Id.* at ¶¶ 44, 48, 49, 54. Those allegations are sufficiently detailed to allow an inference of an agency relationship imbued with fiduciary duties. Count X states a viable claim.

### III.

The amended complaint does not contain factual allegations that support the plaintiff's claims for trade dress infringement, trademark dilution, false promotion of goods, or trade dress dilution. However, the amended complaint states valid claims of false designation of origin, breach of duty of loyalty, and breach of fiduciary duty against the Piku defendants.

Accordingly, it is **ORDERED** that the motion by defendants' Piku and Piku Management Company to dismiss the amended complaint [dkt. # 46] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that counts I, II, and IV of the amended complaint are **DISMISSED WITH PREJUDICE.** The motion is **DENIED** in all other respects.